MARINE MIDLAND BANK,
N.A., Appellant,

v.

Ronald C. MOLLON, et al., Appellees.

No. 92–90–CIV–ORL–19.

United States District Court,
M.D. Florida,
Orlando Division.

June 16, 1993.

John H. Bill, Honigman, Miller, Schwartz & Cohn, Winter Park, FL, for appellant.

William Francis Lawless, Sr., Law Office of William F. Lawless, P.A., Altamonte Springs, FL, for appellees and debtors.

FAWSETT, District Judge.

This case is before the Court upon the Initial Brief of Appellant (Doc. No. 7, filed February 25, 1992); and Answer Brief of Appellee (Doc. No. 8, filed March 12, 1992) as well as the relevant exhibits.

This is an appeal from a Final Judgment of the Bankruptcy Court on September 25, 1991, in case number 90–02413–BKC–6C7; adversary case number 90–0191. The Bankruptcy Court denied the discharge and homestead exemption of Appellee Ronald S. Mollon ("Mr. Mollon") and granted the discharge

and homestead exemption of Appellee Kathleen L. Mollon ("Mrs. Mollon"). Appellant, Marine Midland Bank, N.A. ("Marine"), appeals that decision contending that the Bankruptcy Court's finding was clearly erroneous to the extent that it granted the discharge and homestead exemption to Mrs. Mollon while it denied the same discharge and homestead exemption to Mr. Mollon pursuant to 11 U.S.C. § 727(a)(2)(A). Appellant contends that either Mrs. Mollon committed fraud or Mr. Mollon's fraud should have been imputed to her.

## STATEMENT OF FACTS

Before coming to Florida and filing for bankruptcy, Mr. Mollon operated a business in Buffalo, New York, Quest Computers, Inc. ("Quest" or "Quest Computers"). Quest Computers borrowed its working capital primarily from Marine, and Marine's loans to Quest Computers were personally guaranteed by Mr. and Mrs. Mollon individually. (Bankruptcy Record ("B.R.") at p. 37). In January 1990, Mr. Mollon had a falling out with his principal business partner in Quest, and the partner left the company, taking the company's key employees with him. (B.R. at p. 36). The resulting financial crisis for Quest Computers led Mr. Mollon to meet with a representative of Marine on February 5, 1990 to discuss the problem. This meeting was attended by Mr. Mollon, his attorney, his accountant, two Marine representatives, and Mrs. Mollon. (B.R. at p. 39). Two days later, on February 7, 1990, Marine deemed itself insecure within the meaning of the loan documents and seized the property of Quest Computers. (B.R. at 41–42).

On February 22, 1990, Marine held an auction to dispose of the Quest property. The auction produced a deficiency $447,-731.82, all of which was subject to the individual personal guarantees of Mr. and Mrs. Mollon. Mr. Mollon stated that at the time of the auction, he was aware that he would be personally liable for any deficiency, and that he believed Mrs. Mollon was also aware of that fact. (B.R. at pp. 49–50). On February 27, 1990, Marine filed a civil suit in New York state court claiming damages jointly and severally against Mr. and Mrs. Mollon in the amount of $447,731.82.

As their financial troubles deepened in early February 1990, Mr. and Mrs. Mollon met with Reza Ghaffari, M.D. and his wife Patricia Ghaffari to explore the possibility of obtaining a third mortgage on the Mollons' personal residence in Clarence, New York— the Mollons' sole asset of significant value. (B.R. at p. 74). Patricia Ghaffari is Mr. Mollon's sister, and Dr. Ghaffari is Mr. Mollon's brother-in-law. Dr. Ghaffari controls an entity known as the Springville Medical Group. (B.R. at p. 72). The Springville Medical Group agreed to provide a third mortgage to Mr. and Mrs. Mollon on their Clarence, New York, residence in the amount of $255,000—to be paid in cash. (B.R. at p. 74). A closing was held on March 2, 1990; both Mr. and Mrs. Mollon attended and signed the necessary documents. (B.R. at p. 198).

The idea of a third mortgage had been suggested earlier by Marine as a way to infuse Quest Computers with more capital, and in their initial discussions with the Ghaffaris, the Mollons apparently intended to resurrect Quest as an on-going concern. In early February, before turning to the Ghaffaris, the Mollons had been denied a third mortgage by a bank in Buffalo. Mrs. Mollon handled this transaction. (B.R. at p. 154). Later, however, after Quest was shut down by Marine, the Mollons abandoned their plan to invest more money in Quest, and the Ghaffaris agreed to finance a new business venture for the Mollons outside of the state of New York.

On March 3, 1990, one day after securing the third mortgage from the Ghaffaris, the Mollons were served in the civil action brought against them by Marine to recover the deficiency. Mr. and Mrs. Mollon never advised Marine of their discussions with the Ghaffari's concerning the third mortgage, and they never disclosed to Marine their intention to pursue new business ventures outside of New York. (B.R. at p. 74).

Between February 28, 1990 and March 5, 1990, Mr. Mollon investigated job opportunities by reviewing advertisements in newspapers from other states. When asked at

whose suggestion it was that he buy the out-of-state newspapers, he answered: "it's hard to say whose suggestion, it was basically we were discussing it as a family and one of the options that we were discussing was the fact that maybe get a fresh start that we ought to look out of our community that we were currently living in." (B.R. at p. 51). When Mr. Mollon received a job offer in Dallas, Texas, he announced this to his sister and other family members, and they said, "well, look if you're going to do that why not go into—why not go to Florida?" (B.R. at p. 150).

On Thursday, March 1, 1990, Mr. Mollon became interested in a newspaper ad in the Miami Herald for MyComp Computer Systems, Inc. ("MyComp"), in Orlando, Florida and called to inquire about its availability. (B.R. at pp. 55–56). On the following Monday, March 5, 1990, Mr. Mollon flew to Orlando to assess the feasibility of purchasing the company. On the same day he arrived to look at the business, Mr. Mollon's diary reflected that he "took domicile on this day,"[1] and he later filed "domicile papers" in Seminole County, Florida, stating that he took domicile on March 5, 1990. (B.R. at p. 61). On March 6, 1990, Mrs. Ghaffari came to Orlando, and she purchased MyComp Computer Systems on Mr. Mollon's recommendation for $25,000 in cash. (B.R. at p. 64). Mr. and Mrs. Mollon did not invest any of their own capital in the business.[2]

On March 8th and 9th, 1990, the Mollons shopped for houses in the Orlando area, with Mrs. Mollon being primarily responsible for making a selection. (B.R. at pp. 69–71, 90, 189). At 11:45 a.m. on Friday, March 9, 1993, the Mollons located a house to their liking. Three hours later, they signed a contract to pay $284,000 in cash for the house, (B.R. at pp. 83, 89) after negotiating over the price for less than an hour. (B.R. at p. 191). At 8:30 a.m. March 12, 1990, the following business day, Mr. and Mrs. Mollon went together to see a Florida bankruptcy attorney whom they located in the Yellow Pages. They decided to visit a bankruptcy attorney, according to Mr. Mollon, because

we thought it would be a good idea to consult with an attorney down here to let him know that we were moving down to Florida. Tell him the good news and also tell him that we've got these problems and get that organized so we knew how to go about it.

(B.R. at p. 100).[3] When asked whether the decision to consult a bankruptcy attorney came "out of the blue," Mr. Mollon stated that it did not, because "[b]asically, it was an on-going piece of business with us." (B.R. at p. 102).

The purchase price of the Mollons new house in Florida exceeded the Mollons' assets by approximately $30,000, and therefore the Mollons obtained an additional $20,000 from Mrs. Ghaffari and $10,000 from Gladys Joyce, Mrs. Mollon's aunt. (B.R. at pp. 84–86). Although the Mollons indicated that they intended to pay these monies back, the record shows that there was no express agreement concerning repayment, and the bankruptcy court treated these payments as gifts. (B.R. at pp. 84–88, 201–02).

The Mollons closed on their new house on March 15, 1990. On April 2, 1990, the first payment was due to the Springville Medical Group on the Mollons' third mortgage on their Clarence, New York property, but no payment was made. (B.R. at p. 114). Springville Medical Group made no effort to foreclose on the mortgage.[4]

---

1. Throughout his testimony, Mr. Mollon indicated that he frequently entered important information in his "diary" after the fact to assist his recollection of when events occurred, "in case it ever came up." (B.R. at pp. 53–54, 61, 103–04, 116–17, 159).

2. On March 12, 1990, Mr. Mollon became a MyComp employee at a salary of $50,000 per year. Mrs. Mollon worked part-time at MyComp. (B.R. at pp. 65, 67)

3. Mr. Mollon stated that he had never previously discussed bankruptcy with an attorney, other than one conversation in early February, 1990, in which he complained to Gary Schober, the attorney for Quest Computers, that creditors were pressuring him. Mr. Schober told Mr. Mollon not to be afraid to use the "B-word." Mr. Mollon understood this to mean, "do not be afraid to threaten filing for bankruptcy." (B.R. at pp. 112–13).

4. At the time of the bankruptcy hearing in September of 1991, purchasers had signed a sales

On May 23, 1990, Marine notified the Mollons that it had recorded a final judgment in Florida in the amount of $447,731.82. On June 25, 1990, Marine notified the Mollons that they were to be deposed in aid of execution on Marine's judgment. On that same day, Mr. and Mrs. Mollon filed Chapter 7 bankruptcy in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division.

On Question 12b of their bankruptcy Schedules, when asked to list information pertaining to transfers of property within the last year, Mr. and Mrs. Mollon failed to disclose the existence of the third mortgage on their Clarence, New York property. (B.R. at pp. 125, 134). Mr. Mollon stated that he "had no good answer" for why they did that. (B.R. at p. 181). When Mrs. Mollon was asked about the omission, she stated: "I believe we did not understand the question correctly. We were under the impression that the property was still in our name, that we didn't transfer it." (B.R. at p. 193). Additionally, the Mollons incorrectly indicated that they had resided in this district for the preceding 180 days. Mrs. Mollon testified that she read the bankruptcy Petition and the Schedules before she signed them, and her signature appears on the pages which contain the misleading information. (B.R. at p. 192–94).

## BANKRUPTCY COURT'S FINDINGS

The bankruptcy court found that "[w]ith regard to § 727(a)(2), we are persuaded that the overall effect of the testimony and the evidence is that this Debtor[5] who clearly by law is entitled to convert nonexempt assets to exempt assets did so in this case with a fraudulent intent." (B.R. at p. 249). The bankruptcy court determined that Mr. Mollon was aware that he had equity in property that would otherwise be available to creditors unless he found a way to transfer and protect it. (B.R. at p. 249). As evidence of Mr. Mollon's fraudulent intent, the bankruptcy

court noted that: (1) the Mollons obtained the third mortgage from a corporation controlled by a family member; (2) the transaction was designed so as not to put the family member at risk of loss; (3) the amount of money involved was significant; and (4) the omission of the transaction from the bankruptcy Schedules was significant. (B.R. at p. 251). The bankruptcy court was convinced of Mr. Mollon's fraudulent intent by the pattern of his activities, including his interest in moving to either Florida or Texas and the decision to immediately invest the proceeds of the third mortgage in a new house in Florida.

As to Mrs. Mollon, however, the bankruptcy court stated:

> When we try, however, to see whether or not it is possible to simply transfer or impute that fraudulent activity on the part of the Debtor under 727(a)(2)(A) to his wife, we find that there is a failure of proof. When we consider both his testimony and her limited testimony and the facts that have been introduced, we are not persuaded that there was any active participation by the debtor Kathleen Mollon in connection with the evidence that we received in this case.

(B.R. at p. 251–52). With this finding, the bankruptcy court granted Mrs. Mollon a discharge and granted her request for a homestead exemption.

## DISCUSSION

A district court "may affirm, modify, or reverse a bankruptcy judge's judgment ... and findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses." 11 U.S.C.Bankr.R. 8013 (1988). A district court may not weigh the evidence. *Firstbank v. Pope*, 141 B.R. 115, 117 (E.D.Tex.), *aff'd*, 979 F.2d 1534 (5th Cir.

---

contract on the Mollons' house in Clarence, New York, but when the court questioned Mr. Mollon about the details of the contract, the Mollons' attorney informed the court that "Mrs. Mollon may know more about those situations." (B.R. at p. 173).

5. Throughout its opinion, the bankruptcy court refers to Mr. and Mrs. Mollon as "Debtor and his wife." Because Mr. and Mrs. Mollon are debtors equally in their Chapter 7 filings, this Court will simply refer to them as Mr. and Mrs. Mollon.

1992). "Instead, the district court must ascertain whether the evidence supports the findings of the bankruptcy judge and determine, after reviewing all the evidence, whether the district court is 'left with the definite and firm conviction that a mistake has been committed.'" *Id.* (citing *In re Webb*, 954 F.2d 1102, 1104 (5th Cir.1992) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). Legal conclusions of the bankruptcy court are subject to *de novo* review. *Firstbank*, 141 B.R. at 118. *See also Goerg v. Parungao (in re Goerg)*, 930 F.2d 1563, 1566 (11th Cir. 1991).

The plaintiff has the burden of establishing the nondischargeability of debt, *see In re Grogan*, 146 B.R. 866, 870 (M.D.Fla.1992), and this burden requires a showing by a preponderance of the evidence. *See In re Grogan v. Gardner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). In this regard, 11 U.S.C. § 727(a)(2)(A) states:

  (a) The court shall grant the debtor a discharge, unless—

    (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

      (A) property of the debtor, within one year before the date of the filing of the petition; or . . . .

In order to prevail on a § 727(a)(2)(A) claim, a plaintiff is required to prove: (1) that a transfer occurred; (2) that the property transferred was property of the estate; (3) that the transfer occurred within one year of the Petition; and (4) that at the time of the transfer the debtor possessed a requisite intent to hinder, delay, or defraud a creditor. *In re Ingersoll*, 106 B.R. 287, 292 (Bankr. M.D.Fla.1989).

Although the intent required to deny a debtor's discharge is actual intent, a finding of actual intent "may be based upon circumstantial evidence or inferences drawn from the course of conduct." *In re Kaiser*, 94 B.R. 779, 780 (Bankr.S.D.Fla.1988) (citing *In re Topping*, 84 B.R. 840 (Bankr.M.D.Fla. 1988). In addition, actual "intent to hinder, delay, or defraud a creditor may be imputed to a debtor where the debtor fails to make a full disclosure of his liabilities in the petition for relief and omits assets of substantial value for the schedules." *In re Sofro*, 110 B.R. 989, 991 (Bankr.S.D.Fla.1990) (citing *In re Gonzalez*, 92 B.R. 960 (Bankr.S.D.Fla.1988); *Crews v. Topping (In re Topping)*, 84 B.R. 840, 842 (Bankr.M.D.Fla.1988) ("Only where the non-disclosed assets [are] of little or no value will such fraudulent intent not be imputed.")).

In the instant case, the parties agree that the first three elements of § 727(a)(2)(A) have been met. The only issue here is whether Mrs. Mollon actually intended to hinder, delay, or defraud Marine. Unfortunately, as the bankruptcy court noted, discharge cases are particularly difficult, and "[t]his is a really hard one." (B.R. at p. 243). The bankruptcy court heard testimony from only two witnesses, Mr. Mollon and Mrs. Mollon.

Although no direct evidence was presented of Mr. Mollon's actual intent to hinder, delay, or defraud creditors, the bankruptcy court imputed the requisite intent to him from the totality of the circumstances. The record is clear that: the Mollons knew of their indebtedness to Marine; they knew they were insolvent; they liquidated their sole asset by obtaining a third mortgage in cash on their house from family members after a bank turned them down; the deal was structured so as not to put the family members at risk; the Mollons immediately used the proceeds to purchase a house in Florida for $284,000 three hours after first seeing it; the following business day they consulted a bankruptcy attorney in Florida; and on their bankruptcy Schedules, they omitted or misrepresented material facts.

From the pattern of this conduct, the bankruptcy court was "persuaded that the overall evidence establishes that it was this debtor's intent to hinder delay or defraud his creditors." (B.R. at p. 251). However, the record also clearly establishes that Mrs. Mollon actively participated in each of the trans-

actions that the bankruptcy court identified as evidence of Mr. Mollon's fraudulent intent. Mrs. Mollon personally guaranteed the Marine loans. She attended the February 5, 1990 meeting with Marine officials at which time Marine was informed of Quest's severe financial difficulties. She participated in the discussions with the Ghaffaris concerning the third mortgage and the use to which the money should be put. She attended the closing with the Ghaffaris and signed the mortgage papers. Following the closing, she flew to Florida and chose a new house in what can only be described as a lightning-quick purchase (three hours from start to finish, including less than an hour of price negotiation). On the next business day, she visited the bankruptcy attorney with her husband. She participated in filling out the bankruptcy Schedules that contained material omissions, and, unequivocally, she admits reading over the bankruptcy Petition before signing it.[6]

Mrs. Mollon's course of conduct was the same as her husband's. The record evidence establishes her participation. Although this Court defers to the bankruptcy court's judgment as to the credibility of witnesses, the evidence of Mrs. Mollon's active participation is self-admitted. Neither she nor her husband denies that she was present at the relevant meetings or denies that she signed all the relevant documents with full knowledge of their contents. Therefore, the issue here does not concern the demeanor of witnesses. The sole issue is whether, under the law, Mrs. Mollon acted with the requisite fraudulent intent to deny discharge and whether the bankruptcy court's finding that she did not was clearly erroneous.

In rendering its order from the bench, the bankruptcy court cited nine reported cases upon which it rested its decision.[7] Several of these cases concern the § 727(a)(4) finding which is not at issue on appeal. The remain-

ing cases support the bankruptcy court's decision to deny discharge to Mr. Mollon. One of these cases, *Matter of Reed*, 700 F.2d 986 (5th Cir.1983), deals directly with the issue of whether Mrs. Mollon may be held liable for the actions of her husband. *Reed* correctly states the proposition that intent cannot be imputed from one spouse to another. 700 F.2d at 993. Therefore, Mr. Mollon's intent cannot be imputed to Mrs. Mollon. Each debtor's actual intent must be established.

■ Nevertheless, this Court is left with the definite and firm conviction that a mistake has been committed by denying Mr. Mollon's discharge while granting Mrs. Mollon's discharge. Mrs. Mollon signed all of the relevant documents in this case, including the personal guarantee, the third mortgage papers, and schedules containing the significant omissions. On this basis alone, under the holding of *In re Sofro*, 110 B.R. 989 (Bankr.S.D.Fla.1990), the requisite fraudulent intent could be found as to Mrs. Mollon. The court in *Sofro* stated:

> the debtors assert that Lori Sofro should not be denied her discharge as she is a housewife and unfamiliar with business affairs. The debtors rely on this Court's previous ruling in the case of *NCNB National Bank of Florida v. Eli Sofro and Lori Sofro [In re Rental Journal]*, 111 B.R. 1012 (Bankr.S.D.Fla.1989). In that case, this Court held that Lori Sofro could not be held liable under an agreement executed by her in which she guaranteed the debts of a corporation owned by her debtor husband. This Court reasoned that Lori Sofro had not negotiated the loan with the creditor and was unfamiliar with the business affairs of her husband's corporation. However, in the instant case, Lori Sofro gave false information [on her bankruptcy schedules] regarding accounts owned by her and her husband, about income received by both, and about loan

6. Because the parties failed to transmit the Exhibits along with the Bankruptcy Record, the Court is relying on the undisputed testimony in the record that Mrs. Mollon did in fact sign the relevant documents discussed in this Order.

7. *In re Collins*, 19 B.R. 874 (Bankr.M.D.Fla. 1982); *Matter of Blasendorf*, 29 B.R. 559 (Bankr. M.D.Fla.1983); *In re Elliott*, 79 B.R. 944 (Bankr.

M.D.Fla.1987); *Matter of Walton*, 104 B.R. 861 (Bankr.S.D.Ohio 1988); *In re Klein*, 114 B.R. 778 (Bankr.M.D.Fla.1990); *Matter of Reed*, 700 F.2d 986 (5th Cir.1983); *Norwest Bank Nebraska, N.A. v. Tveten*, 848 F.2d 871 (8th Cir.1988); *In re Davis*, 911 F.2d 560 (11th Cir.1990); *Swicegood v. Ginn*, 924 F.2d 230 (11th Cir.1991).

repayments made to her father. Her participation in the filing of the petition, and her execution under oath, hold her accountable for her misrepresentations on the schedules and statement of financial condition. *Id.* at 992. The court denied Mrs. Sofro's discharge under both 727(a)(2)(A) and 727(a)(4)(A).[8]

In the instant case, the bankruptcy court found that while the omissions on the Mollons' Schedules did not rise to the § 727(a)(4)(A) level, the omissions were, nonetheless, material in establishing Mr. Mollon's fraudulent intent pursuant to § 727(a)(2)(A). The record testimony is clear that Mr. and Mrs. Mollons prepared their Schedules together and that Mrs. Mollon was a knowing participant.[9] Thus, any fraudulent intent imputed to Mr. Mollon in connection with the omissions from the Schedules must also be imputed equally and separately to Mrs. Mollon. Any failure by the bankruptcy court under the facts of this case to impute fraudulent intent to Mrs. Mollon from the Schedule omissions is clearly erroneous.

The bankruptcy court also found that the third mortgage obtained from family members was further evidence of Mr. Mollon's fraudulent intent. In making the inference of fraudulent intent from the friendly nature of this family transfer, the bankruptcy court appeared to distinguish Mr. Mollon's family relationship with the Ghaffaris from Mrs. Mollon's family relationship with the Ghaffaris. The record reflects the following colloquy between counsel for the bankruptcy Trustee (Mr. Saxton) and the court after Mr. Saxton suggested that fraudulent intent should also be imputed to Mrs. Mollon:

THE COURT: But isn't the whole family thing going really the other way? As Mr. Mollon's going around with his sister and the entity is over there and friendly and all that, all she did was get, as far as we can tell from the testimony, secure a gift ahead of time from her aunt, Mrs. Joyce, if I got the name right, but not anything else particularly.

MR. SAXTON: Your Honor, she received two hundred and fifty-thousand dollars to purchase the homestead with that.

THE COURT: Oh, sure, I understand that.

MR. SAXTON: She purchased the homestead with that. And that—

THE COURT: But that's all on the other side of the family unless I misunderstood.

MR. SAXTON: No, I'm saying that her receipt—

THE COURT: I understand that. We're talking fast at each other. You're telling me something I know and I hope I'm telling you something that's correct in the evidence. I'm asking you to correct me on that.

Is not the sister only Mr. Mollon's sister and the Springville connection only Mr. Mollon's family and it is not hers except by marriage, of course?

MR. SAXTON: Yes, Your Honor.

THE COURT: And, likewise, the only funds that came from someone that is her family, if that's the way to say it, is the ten thousand dollars that comes from the unlisted creditor, the unlisted alleged creditor Joyce. I'm not trying to argue inferences or anything, I'm trying to understand.

.    .    .    .    .

She says it was a gift and there's no contradictory evidence on that unless I just don't believe her testimony.

MR. SAXTON: Exactly. I don't think there is any contradictory evidence except, Your Honor, the fact that she did, what really points to her, how we can impute her liability here is that her testimony was

---

8. In order to deny a discharge under § 727(a)(4)(A), the creditor or trustee must prove that the debtor "knowingly and fraudulently, in or in connection with the case ... made a false oath or account."

9. When Mrs. Mollon was asked "Would your testimony be the same as your husband regarding 12(b)? He testified that he didn't understand the question," she answered, "I believe we did not understand the question correctly. We were under the impression that the property was still in our name, that we didn't transfer it."

that she participated in all major decisions of the family and of the family being she and her husband, Ronald. That participation in all those decisions, it was the decision that we're inferring intent to defraud, if the intent is inferred upon him, that she participated in that decision.

THE COURT: I don't think it's all that easy, counsel. I think the *Reed* case that you rely on concludes exactly the opposite with much more active participation by the spouse. No finding against the spouse.

(B.R. at pp. 228–31). This colloquy raises two concerns with this Court. First, the bankruptcy court's distinction between Mr. Mollon's family and Mrs. Mollon's family is unfounded. There is no record evidence suggesting that Mrs. Mollon was estranged from the Ghaffaris in any way, and there is no reason to conclude that Mrs. Mollon does not have a family relationship with the Ghaffaris. The record evidence indicates that Mrs. Mollon participated in the discussions with the Ghaffaris.[10] Thus, any fraudulent intent that the bankruptcy court imputed to Mr. Mollon from the family-nature of this transfer of cash for a third mortgage must also and equally be imputed to Mrs. Mollon. As discussed above, the record gives no indication that the Ghaffaris did not consider Mrs. Mollon a member of the family, and the bankruptcy court's failure to impute fraudulent intent to Mrs. Mollon from this family transfer is clearly erroneous.

Second, the bankruptcy court's reliance on *Reed* is misplaced to the extent that the court relies on *Reed* for the proposition that intent cannot be imputed from a husband to a wife. Counsel's argument in the colloquy quoted above is not that intent should be imputed from Mr. Mollon to Mrs. Mollon, but that intent should be imputed to Mrs. Mollon from the circumstances of her own partic-

ipation in the events. The record is abundantly clear that Mr. and Mrs. Mollon discussed their situation throughout the relevant period and made their decisions jointly. In addition, Mr. Mollon's frequent use of the pronoun "we" indicates that he was not making these decisions alone. For example, the record contains the following colloquies between Mr. Bill, counsel for Marine, and Mr. Mollon:

Q. So some point you changed your mind. You were not going to use that money to reactivate Quest. You were going to use it for something else?

A. That's right.

Q. Tell me or the Court which day that was?

A. The day we decided to do something else?

Q. Did you write that down in your diary?

A. I don't think I did, but I'll take a look. Basically, it didn't happen on—again, on a specific date or a specific time. It was a decision process that we were going through as to what we were going to do....

(B.R. at p.p. 77–78).

\* \* \* \* \* \*

Q. Mr. Mollon, at the time that you came to Florida on March 5, 1990, and a notation was made as to your establishing a domicile here, at that point on March 5th, 1990, did you still intend to pay back Marine Midland for the amounts that were owed to them at that point?

A. We didn't—we were hoping we could work out some sort of arrangement.

Q. You never let them know you were moving to the State of Florida, isn't that true?

A. Correct.

Q. What was your attitude at that time, the reason or the purpose for borrowing the money?

A. We wanted to—we knew we were going to be facing some difficult times as well, and wanted to keep the business going. And we were looking for ways—a way to accomplish that....

(B.R. at pp. 139–40).

---

**10.** Mr. Mollon, who frequently used the term "we" in his testimony when referring to himself and his wife (see below), testified as follows:

Q. Now, considering the time frame, would you care to say exactly when you first talked to the Ghaffaris in regard to your borrowing the money?

A. We started discussing the family matter probably the weekend of early February, probably February 3rd, 4th.

Q. Right after the fellow walked out?

A. No, I did not. We weren't sure ourselves we were moving to Florida.

(B.R. at pp. 118–19).

\* \* \* \* \* \*

Q. And how did you come back to Florida?

A. We drove down.

Q. We?

A. My family and myself.

(B.R. at p. 156).

\* \* \* \* \* \*

THE COURT: Yes. It reads, have you made any other transfers absolute or for the purpose of securing or any other disposition of real or tangible personal property during the year immediately preceding the filing of the original petition?

How could you read that not to include the third mortgage?

THE WITNESS: I don't have a good answer for that. Basically the answer I have is N/A, not applicable. I guess we filled out this form by hand and then it was transposed. We didn't intend to hide it, we put it on the Schedule.

I wish I had a better answer for why we said N/A, but it was no reason except for what we said on our handwritten copy. We put it in the Schedule. Like I said, we didn't deny we did it. We just misunderstood the question or maybe a clerical error. I wish I knew.

(B.R. at p. 181).

Mrs. Mollon's testimony also confirms that the decisions were made jointly. Under questioning from Mr. Bill, she stated as follows:

Q. Now, Mrs. Mollon, also your husband testified that at some point he changed his mind as to whether or not the proceeds from the third mortgage from the Clarence property would be used to reactivate Quest Computer.

He changed his mind or I believe he said it was a family decision; correct?

A. Right.

. . . . .

Q. Before he came down on March 5th, Mr. Mollon, to look at MyComp Computer Systems, Inc., had you and your husband collectively decided that you were going to move to the State of Florida before March 5th?

A. We decided we would do what was best for the family and if that included moving somewhere to get a good job and to resettle, that's what we would do.

Q. That was before March 5th you made that decision?

A. No. I'm a little confused on— March 5th is the date Ron came here, right?

Q. Yes, ma'am.

A. We thought about it. We talked about it when we bought the newspaper, whatever date that was.

(B.R. at pp. 187–88).[11]

Counsel for Mrs. Mollon argues that her testimony was insufficient to establish her intent because opposing counsel failed to question her thoroughly. Counsel points, specifically, to the following question posed to Mrs. Mollon after she listened to her husband's testimony in full:

Q. Now, Mrs. Mollon, would it be a fair characterization on your part to say that you adopt all of his testimony as your own and that's a fair and accurate recitation of the events as they occurred?

A. Most of it, yes.

(B.R. at p. 186). Although counsel continued to inquire further of Mrs. Mollon, he did not retrace the entire sequence of events that he had covered with Mr. Mollon. Nevertheless, the unrefuted record evidence of Mrs. Mollon's participation in the events surrounding the sudden pre-bankruptcy transfer of the non-exempt Clarence assets to exempt Florida assets is overwhelming. For instance, Mrs. Mollon participated in the same pattern of conduct from which the bankruptcy court rightly inferred Mr. Mollon's actual intent to

---

**11.** The Court is unpersuaded by the argument by counsel for Appellees that the Mollons' use of the pronouns "we" and "us" rather than "I" at various times reflects the length of their marriage rather than any joint participation on their part. The record indicates that the Mollons also used the singular pronouns where appropriate. *See, e.g.,* B.R. at p 176.

hinder, delay, or defraud creditors. She attended the initial meeting with Quest's creditors two days before the business was shut down. She participated in the discussions with the Ghaffaris about obtaining a third mortgage in cash. She participated in the sudden investment of that cash in a house in Florida, knowing of the pending lawsuit by Marine, and on the next business day, she participated in the meeting with the bankruptcy attorney. Finally, she fully participated in filling out the bankruptcy Schedules which contained material omissions. Therefore, to the extent that the bankruptcy court imputed fraudulent intent to Mr. Mollon but not Mrs. Mollon from these circumstances, the finding is clearly erroneous.

The Court agrees with the bankruptcy court's legal foundation for imputing fraudulent intent to Mr. Mollon. Both *Matter of Reed,* 700 F.2d 986 (5th Cir.1983) and *In re Collins,* 19 B.R. 874 (Bankr.M.D.Fla.1982) support the bankruptcy court's finding that Mr. Mollon acted with the requisite actual intent and the court's denial of his discharge. Equally, however, these cases support a finding that Mrs. Mollon acted with actual intent to hinder, delay, or defraud her creditors and that her discharge should also be denied. This conclusion is further supported by *In re Sofro,* 110 B.R. 989 (Bankr.S.D.Fla.1990).

Finally, the bankruptcy court raised valid policy considerations that are worth recognizing in this case. After it was suggested to the bankruptcy court that Mrs. Mollon's discharge should be granted because she was simply doing what her husband told her to do, the court stated:

> THE COURT: Hang on a second because I'm telling you I'm struggling with that one. One way is to say, well, we just have some spouse who's sort of traveling along and someone who obviously knows much more than a business oriented person.
>
> Now, if we look at it that way, aren't we going to allow any husband and wife situation, for one spouse to be outrageously fraudulent, I'm not suggesting that's true in this case, and then the other spouse to simply say, well, gee, I was just sort of going along?

> We wind up always allowing it—the result to stay in place because we're going to let a discharge be available to someone who would otherwise not be entitled to it. And ultimately that person will now become the new head of the corporation and employing the other spouse always below garnishable wages, holding all the assets and issues that we can't be unfamiliar with among the group of counsel that I have here today. That doesn't seem like what the Code ever contemplated. And that's the contention I'm feeling and I'm taking a look at this.

(B.R. at pp. 241–42). The court's observations and concerns are well-taken. The difficulty in the marital context is that while the court may not impute intent from a husband to a wife, lingering stereotypes of women may discourage a court from legitimately imputing intent to women when the circumstances of the case would otherwise warrant. In part, this lingering tendency stems from the "shrinking violet" cases in which courts rightfully recognized that a wife's participation in the scheme of her husband may have been innocent. The claim by a wife that although she participated extensively in a fraudulent scheme which involved her husband, she may not have a fraudulent intent imputed to her because she was an innocent participant should be subject to careful scrutiny.

The law holds each and every person responsible for his or her actions, and only in the rarest of cases will the court inquire into the independence of a woman's will from that of her husband's. For the same reason that the court may not impute intent from one spouse to another, the court may not artificially shield one spouse from liability based upon traditional gender roles. Each and every person must be judged individually.

In the instant case, the record is clear that Mrs. Mollon is not a "shrinking violet." Mrs. Mollon demonstrated her financial acumen through her independent efforts to pursue a third mortgage on the Clarence property from the bank; her handling of the sales contract for the Clarence property (which her counsel indicated was not within Mr. Mollon's realm of knowledge); and her work

handling the books at their new business, MyComp. The fact that Mrs. Mollon attended the initial meeting with Marine officials, Quest's attorney, Quest's accountant, and Mr. Mollon on February 5, 1990, where Quest's perilous financial condition was discussed, also demonstrates her relative sophistication.

These facts, taken together, indicate that Mrs. Mollon must be treated as a responsible individual, fully capable of participating in the decisions at issue in this case. The bankruptcy court's finding as to Mr. Mollon, that his course of conduct manifested actual intent to hinder, delay or defraud creditors, must be applied equally to Mrs. Mollon. The record evidence is abundantly clear that she was a knowing and wilful participant in the conversion of exempt to nonexempt assets, and the fraudulent intent imputed to Mr. Mollon pursuant to § 727(a)(2)(A) must also be imputed to Mrs. Mollon. The bankruptcy court's finding to the contrary is clearly erroneous and leaves this Court with the definite and firm conviction that a mistake has been committed.

For all of the above reasons, the decision of the bankruptcy court is **REVERSED IN PART** in accordance with this Order. The discharge of Mrs. Kathleen L. Mollon is **DENIED**.

**DONE AND ORDERED.**