In re William J. CORNELIUS, Debtor.

Felicia S. Turner, United States Trustee, Plaintiff,

v.

William J. Cornelius, Defendant.

Bankruptcy No. 03–42222–PNS. Adversary No. 04–03010.

United States Bankruptcy Court, N.D. Florida.

Sept. 12, 2005.

Thomas W. Dworschak, Assistant United States Attorney, Atlanta, GA, for plaintiff.

Steven W. Bowden, Pensacola, FL, for Defendant.

### ORDER DENYING DISCHARGE OF DEBTOR

MARGARET A. MAHONEY,
Bankruptcy Judge.

This case is before the court for the trial of issues relating to the defendant's discharge. The court has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. This adversary case is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the court has the authority to enter a final order. For the reasons indicated below, the court is denying the discharge of the defendant, William J. Cornelius.

### FACTS

William J. Cornelius filed a chapter 7 bankruptcy case in the Northern District of Florida on August 13, 2003. Prior to the filing, he had been in the building trades for many years. His bankruptcy was, in part, the result of financial problems caused by a judgment against him of $406,955.36 by Robertson–Ceco. He disputed the validity of the debt but ultimately consented to the judgment being entered due to lack of funds for his defense. The judgment was based upon a personal guarantee he signed for his business, N.I.C. Inc.

### N.I.C., INC.

Cornelius had formed N.I.C. Inc. in October 1996 as an Alabama corporation. He was the sole shareholder and president. His wife, Mary Nash, was the secretary-treasurer of N.I.C. and his son, William Scott Cornelius, was the vice president. The dispute with Robinson–Ceco arose in 2001. Robinson–Ceco demanded payment of $279,065.72 from N.I.C. Inc. by letter on September 12, 2001. Cornelius vigorously disputed the debt was owed. No call on his personal guarantee had been made. On September 22, 2001, a check in the amount of $250,000 was drawn on the N.I.C. Inc. account to the order of William J. Cornelius. William Cornelius deposited that check in a new personal checking account on September 24, 2001. N.I.C. Inc. filed a withdrawal of

its status as a foreign corporation authorized to do business in Florida on December 12, 2001. At some point around the end of 2001, N.I.C., Inc. ceased to operate. On January 28, 2002, Robinson–Ceco sued William J. Cornelius for the debt allegedly owed to it.

### N.I.C. CONSTRUCTION, INC.

N.I.C. Inc. had been registered to do business in Florida under the name N.I.C. Construction, Inc. On December 12, 2001, the defendant withdrew N.I.C. Inc.'s registration to do business in Florida and, on the same day, formed N.I.C. Construction, Inc. and registered it as a Florida corporation. Mr. Cornelius was the incorporator, sole shareholder, sole director, and president. Cornelius testified that he incorporated this company to let his son establish a business in Florida, not to keep assets away from Robinson–Ceco. He was getting older and wanted his two sons to take more day to day responsibility of the business. On February 26, 2002, he closed the personal checking account he had opened in September 2001 and put the remaining funds amounting to $141,339.91 in the N.I.C. Construction, Inc. account to pay its bills. Cornelius believes that most of the rest of the original $250,000 he deposited in the account went to pay N.I.C., Inc. bills. Other than the personal account he had for the approximately 6 month period from September 2001–February 2002, Cornelius had no personal checking account from February 2002 to the date of trial. Cornelius testified that he withdrew the money from the N.I.C., Inc. account due to the divorce proceedings with his wife. Mary Nash had access to the corporate account of N.I.C., Inc.

On May 23, 2002, William J. Cornelius, the defendant, transferred all of the shares of N.I.C. Construction, Inc. to his son, William S. Cornelius, for no consideration. He also resigned as an officer and director of the company, leaving William S. Cornelius as the sole director, officer and shareholder. William J. Cornelius told Bruce Haught, his attorney, that his son, William S. Cornelius (Scott), was doing all of the work and he should have put the business in his name in the beginning. Scott was told of the transfer to him, but was not told the reason or consulted about the transfer. He thought the transfer might have been related to his father's divorce which "got pretty ugly at one time." Although Scott was the sole shareholder and director of N.I.C. Construction, he did not control the corporate checkbook. The debtor, and later, his wife, Mary Nash, did.

William J. Cornelius continued to be active in the business of N.I.C. Construction, Inc. He sold the company's services to contractors and, in part, managed the office of N.I.C. Construction, Inc. William S. Cornelius had very little to do with banking, accounting, or other financial matters of the business. He worked in the field for the company.

N.I.C. Construction, Inc. closed a corporate checking account on June 20, 2003 after having opened a new account one week earlier. The defendant and Mary Nash had a break-in at their home where they maintained a computer with the company banking information. At the bank's suggestion, they had opened a new account to protect the company assets.

### MARITAL SITUATION OF DEFENDANT

William J. Cornelius is married to Mary Nash. He and Ms. Nash were first married in 1983. They were divorced in 1986. They remarried in 1988 and remain married to this day. In 2001, Mary and William were having problems and they separated again. They were separated from August 2001 to mid September 2002.

Each had an attorney. A court order was issued requiring William Cornelius to pay certain expenses. In September 2002, they reconciled. As part of the divorce proceedings ongoing before the reconciliation, William deeded to Mary their marital residence in Birmingham on May 10, 2002. On May 23, 2002, she deeded to him a lot they owned in Walton County Florida (the Driftwood Estates lot). These deeds were only partial arrangements of the marital assets between them.

## DRIFTWOOD ESTATES LOT

On May 30, 2002, William J. Cornelius deeded the Driftwood Estates lot to his son, William S. Cornelius. The lot was located in Walton County, Florida at Sandestin. Cornelius testified that he did the transfer to keep the asset out of reach of the divorce settlement ongoing with Mary Nash. His son Scott also testified that his father told him the transfer was because of the divorce. On July 22, 2002, the lot was sold by William J. Cornelius to a third party. The defendant handled the sales transaction even though the lot was not in his name (at least as between the defendant and his son). For some unexplained reason, the title company made the defendant deed the property to the buyers (perhaps because the quitclaim deed had not been recorded or not properly recorded). Both the debtor and his son were at the closing. The net sales proceeds of $123,865.34 were made payable to William J. Cornelius. He deposited them in the N.I.C. Construction, Inc. account because N.I.C. Construction, Inc. had no money for operations and needed it. The company had no jobs for a period of time. Scott Cornelius also testified to these facts. Scott also stated that the money was put into the account to make payroll as a gift to him or the company. William J. Cornelius and Scott never discussed if the debtor was to get the money back.

## DEFENDANT AND MARY NASH'S HOMESTEAD

On October 31, 2002, Mary Nash and William Cornelius purchased a home in both of their names at 5822 East Bay Boulevard, Gulf Breeze, Florida. On July 2, 2003, William Cornelius quitclaimed his interest in the home to Mary Nash because she asked him to do so. The consideration was "her love." Ms. Nash wanted to keep the house regardless of Cornelius' problems or their marital problems. Ms. Nash had supplied all but $5,000 of the down payment for the home from funds she had received from her father's estate. The $5,000 earnest money had come from the N.I.C. Construction, Inc. checking account on September 17, 2002. This payment was within the first week of Mary Nash's work at N.I.C. Construction, Inc. She testified that she took the money out in this way in lieu of salary. From December 2002 through June 2003, mortgage payments on the home loan were paid directly from the N.I.C. Construction, Inc. account.

## EXPENSES PAID FOR DEFENDANT FROM N.I.C. CONSTRUCTION, INC.

As stated above, William J. Cornelius had no checking account from February 2002 to date. Some of his expenses were paid directly by N.I.C. Construction, Inc. rather than Mr. Cornelius receiving a regular paycheck. At year end, N.I.C. Construction, Inc. tax returns treated the expense payments as wages to Mr. Cornelius. The same was true, as to certain expenses, for Mary Nash. For the defendant, Mary Nash, William S. Cornelius, and Jay Cornelius (the defendant's other son), the business (either N.I.C., Inc. or N.I.C. Construction, Inc.) paid the loan or lease payments for their motor vehicles.

For Mr. Cornelius, the companies paid his credit card bill (which included busi-

ness expenses), his health insurance, rent or house payment, utility bills, telephone bill, and gasoline bills. He also received undetermined cash amounts for spending money. According to Cornelius, he never received more that $20–40 at a time in this fashion. On one occasion, on June 13, 2003, N.I.C. Construction, Inc. paid $7,776.84 to the Internal Revenue Service for his 2001 delinquent tax bill. Mr. Cornelius testified that he was not aware of this payment until a few days before the trial in this case. Mary Nash, the bookkeeper for N.I.C. Construction from about mid-September 2002 to at least Cornelius' bankruptcy filing, paid the bill to prevent any problems for herself and her husband from the taxing authorities. Mr. Cornelius received various checks that he cashed and used to pay workers who did not have bank accounts and had difficulty cashing checks. He sometimes wrote the checks himself because he had signatory authority on the account.

Ms. Nash, in lieu of taking her wages of $40,000–50,000 per year, had the company directly pay the home mortgage payment. N.I.C. Construction also paid her American Express bill because the bulk of it was business expenses. She charged the company travel, supplies, etc., to the account. Some of the items on the bill were personal and the company paid those as well when she paid the bill. The personal bill payment was in lieu of other salary payments. Mary Nash loaned the company money over the years. Therefore, she took more than her salary out of the company at times in repayment of her loans. When N.I.C. Construction, Inc. filed bankruptcy, the company owed her approximately $50,000.

### GARNISHMENT OF DEFENDANT BY ROBINSON–CECO

On June 17, 2003, Robinson–Ceco garnished the wages of William J. Cornelius in its suit against him individually in federal court. After the garnishment was issued, William J. Cornelius filed a response to the garnishment that stated, under oath, that he provided more than one-half the support for a dependent and had net earnings of more than $500 per week. Before a hearing could be held on the garnishment issue, the defendant filed a chapter 7 bankruptcy case.

The response included a letter signed by Mary Nash that stated Cornelius had an annual salary of $42,000. Nash anticipated this would be Cornelius' salary before the company had financial problems. The debtor testified that he did not know where the $42,000 figure came from because he was just having his expenses paid and received no net earnings.

Cornelius got the garnishment response form from Bruce Haught, the attorney he had used for his Florida corporate issues. Bruce Haught told him he could claim his wages exempt as a head of household if he was one and sent him the form to do so. Bruce Haught did not ask Cornelius if he had any dependents, but Bruce Haught assumed his wife was a dependent. Haught did not ask what the debtor's wife earned. Bruce Haught did not tell the debtor of the wage limit.

### THE BANKRUPTCY FILING

On August 11, 2003, William J. Cornelius met with attorney Bruce Haught, who filed his bankruptcy petition. Haught had previously done legal work for the defendant. He had incorporated N.I.C. Construction, Inc. He had handled the transfer of defendant's stock in N.I.C. Construction, Inc. to defendant's son and he had prepared the deed transferring the Driftwood Estates lot from the defendant to his son.

Mr. Cornelius filled out a bankruptcy client questionnaire given to him by Haught. Part of the form was missing. It is not clear whether page 15 was missing when given to Cornelius or only upon return to Haught. Page 15 of the form included Statement of Affairs questions 1–3a. Mr. Haught also crossed out as not applicable, on page 19 of the questionnaire, question 16 on the Statement of Affairs about business relationships of the debtor because Haught thought the section only applied to corporate debtors. Cornelius and Haught met after Cornelius filled out the questionnaire. On August 13, 2003, Cornelius came to Haught's office and reviewed the bankruptcy petition schedules, and statement of affairs, signed them and filed them.

The following items were allegedly not correct:

1. No disclosure of an interest in a 1999 Jeep Cherokee worth approximately $750

2. No disclosure of an auto loan of $4500 for the Jeep

3. No disclosure of his officer, director or ownership positions in any businesses in the six years before the bankruptcy filing date

4. No disclosure of income for the two years prefiling

5. No listing of codebtor status on his home loan

6. No listing of payments of $600 or more made to creditors within 90 days before filing

7. No listing of the transfer to his wife of his interest in their homestead within one year of filing

## FIRST MEETING OF CREDITORS

At the first meeting of creditors on October 7, 2003, William J. Cornelius was asked whether he received any income from N.I.C. Construction, Inc. in 2002 and he responded "No." He also stated that Mary Nash "used her money, her assets to buy" their homestead and that the funds were all her separate funds. As to what became of the $123,865.34 check from the sale of the lot in Driftwood Estates, Mr. Cornelius stated that "he lived off of it." Mr. Cornelius also stated that he was a "salesman" for N.I.C. Construction, Inc. and received "no income" from the business in 2002.

## RULE 2004 EXAMINATION

On February 4, 2004, Mr. Cornelius' 2004 examination was held. At that examination he was asked about his affiliation with N.I.C. Construction, Inc. He stated "I worked for them… [It has] never been any different than working for them." He stated that the company did pay his expenses. He also testified that he had not had a bank account between January 1, 2001 and August 13, 2003. When asked about the $123,865.34 check from the lot sale, he stated that he gave the money to his son, William S. Cornelius, because "I felt like it was back payment for what I had not paid him in the past."

## RULE 30(B)(6) DEPOSITION

At his March 16, 2004 deposition, Mr. Cornelius stated that the $123,865.34 was "deposited for them [N.I.C. Construction, Inc.] to use. I expect to get the money back at some time … certainly when they get to making money." He testified that the company, due to its recent formation, needed the money. He also stated that the Florida lot was his property. He again testified that the company paid his expenses of about $50,000 per year.

## 2004 AMENDMENTS TO SCHEDULES AND STATEMENT OF AFFAIRS

William J. Cornelius amended his schedules and statement of affairs on December

3, 2004. The amendments added disclosures about the 7 issues that the U.S. Trustee alleges were incorrect in the original petition except item 7. The debtor did not list his quit claim deed to his wife in July 2003 of his interest in their homestead. The schedules also did not list payments of $600 or more made within 90 days of bankruptcy on the defendant's debts for which payments were made by someone other than the debtor. Mary Nash paid the mortgage payments with checks directly from N.I.C. Construction, Inc. Mary Nash also paid Cornelius' unpaid 2001 federal tax bill without Cornelius' knowledge.

## WILLIAM J. CORNELIUS' HEALTH

The defendant has had a drinking problem and prescription drug abuse problem for some time. This is at least part of the reason for the marriage difficulties of the defendant and Mary Nash. She did not trust him with the parties' assets or record keeping and sought to protect herself and their assets from Mr. Cornelius by putting items in her name, keeping her monies separate, and paying all of the bills. Mr. Cornelius was involuntarily hospitalized due to his health problems and a suicide attempt at about the time of the bankruptcy filing. He has been depressed. He is currently taking numerous medications.

## PRIOR CONVICTION

William J. Cornelius was convicted of a false material declaration while under oath in a proceeding before a federal grand jury and of mail fraud on February 5, 1986. Mr. Cornelius paid a fine and was on probation for a period of time for the offense.

## LAW

The United States Trustee asserts that William J. Cornelius' discharge should be denied pursuant to 11 U.S.C. § § 727(a)(2) and (a)(4). Section 727(a)(2) precludes a discharge if a debtor, "with intent to hinder, delay or defraud a creditor or [trustee], has transferred, removed, destroyed ... or concealed ... property of the debtor, within one year before the date of the filing of the petition." In this case, that property would be Cornelius' interest in the homestead lived in by him and Mary Nash, the $5,000 earnest money check from N.I.C. Construction, Inc. to further the purchase of their home, and the checks he or Mary Nash wrote on the N.I.C. Construction, Inc. account for Cornelius' benefit, both pre- and postpetition.

Section 727(a)(4) precludes a discharge if a debtor "knowingly and fraudulently, in or in connection with the case ... made a false oath or account." The Trustee alleges that the seven deficiencies in his initial schedules and statement of affairs listed above are false oaths. He also asserts that the following later statements were untrue:

1. At first meeting of creditors
   a. The statement that debtor lived off the $123,865.34 Florida lot sales proceeds
   b. The statements that Mary Nash used her money or assets to buy the parties' homestead and that it was all her separate funds.
2. Rule 2004 Examination
   a. The statement that he "just worked for" N.L.C. Construction, Inc.
   b. The statement that he did not have a personal bank account from January 1, 2001 to August 13, 2002.
   c. The statement that he did not know where the $141,339 check deposited in N.I.C. Construction's account came from
3. Rule 30(B) deposition

d. The statement that the $123,865.34 check from the Florida lot sale was back payment to his son William S. Cornelius

e. The statement that he was only reimbursed for expenses from N.I.C. Construction, Inc. in 2001–August 13, 2003

f. The statement that the $123,865.34 check was money he expected to get back at some time

Finally, the trustee asserts that the 2004 amendments to Cornelius' schedules and statement of affairs were still false. First, no mention of the quitclaim deed of the debtor to Mary Nash of the homestead is included even though it occurred within 60 days of the bankruptcy filing. Second, no payments of more than $600 to creditors within 90 days of bankruptcy are disclosed. The trustee asserts that payments Mary Nash made on the mortgage should have been disclosed and the IRS payment should have been disclosed.

A recent decision of Bankruptcy Judge Ray Mullins in the Northern District of Georgia deals with both § 727(a)(2) and (a)(4) denial of discharge issues under similar circumstances. *Eastern Diversified Distributors, Inc. v. Matus (In re Matus)*, 303 B.R. 660 (Bankr.N.D.Ga.2004). In the *Matus* case, The debtor failed to list a transfer of his homestead by quitclaim deed to his wife within 3 weeks of filing bankruptcy. The debtor also omitted numerous items on his schedules. The facts in the case are quite different, but due to the similar issues, the cases cited by Judge Mullins are in many cases the same ones this court would cite. The opinion of Judge Mullins is very thorough. Rather than stringciting to many of the same cites, this court will simply cite to Judge Mullins opinion, and, in so doing, incorporate his reasoning and the law supporting it.

As a general proposition of bankruptcy law, one of the Bankruptcy Code's "fundamental goals is to relieve the 'honest but unfortunate debtor' of his indebtedness, allowing him to make a financial 'fresh start.' "*Id.* at 669–70. "This fresh start in primarily accomplished through the discharge of debt." *Id.* at 670. "Though the Bankruptcy Code provides most debtors with a fresh start, the Code prevents dishonest debtors from improperly using it as a shield.... While the Bankruptcy Code does not expressly require that a debtor file and prosecute the bankruptcy case in good faith, good faith and candor are necessary prerequisites to obtaining a discharge." *Id.* (citations omitted)

"[D]enial of a discharge is an extraordinary remedy and (sic) therefore, statutory exceptions to discharge must be construed liberally in favor of the debtor and strictly against the objecting party." *Id.* at 671(citations omitted). The U.S. Trustee, as the plaintiff in this suit, bears the burden of establishing the grounds for denial of discharge. *Id.* The Trustee must prove his case by a preponderance of the evidence. *Id.* (drawing the standard from *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)); *Haught v. U.S. (In re Haught)*, 242 B.R. 522 (M.D.Fla.1999); *Marine Midland Bank, N.A. v. Mollon (In re Mollon)*, 160 B.R. 860 (M.D.Fla.1993); *Curtis v. Zwirn (In re Zwirn)*, 2005 WL 1978510 (Bankr. S.D.Fla.2005); *Rutland v. Petersen (In re Petersen)*, 323 B.R. 512 (Bankr.N.D.Fla. 2005). Once the U.S. Trustee meets the initial burden "by producing evidence establishing the basis for his objection, the burden shifts to the debtor to satisfactorily explain the loss." *Matus* at 672.

A.

Section 727(a)(2) precludes the grant of a discharge to a debtor who transfers

property within one year of bankruptcy with an intent to hinder, delay or defraud creditors. As stated above, the U.S. Trustee alleges two instances in which Cornelius so acted.

The first instance is the transfer of his homestead interest to his wife on July 2, 2003. Before that date, as a Florida resident, he owned a community property interest in the homestead. This transfer was clearly made within one year of the bankruptcy filing. The U.S. Trustee has established that fact. The Trustee must also establish that the transfer was made with intent to hinder, delay or defraud creditors.

■■■ "[I]ntent is ... difficult to prove. A plaintiff bears the burden of demonstrating actual fraudulent intent; constructive fraud is insufficient." *Id.* at 672 (citations omitted). Courts allow plaintiffs to prove fraud by circumstantial evidence and the presence of "badges of fraud" are factors that courts look at to weigh whether fraud has occurred. *Id.* These badges are: "(1) the lack of adequate consideration for the property transferred; (2) a family or close relationship between the parties; (3) retention of possession for use and benefit; (4) financial condition of the transferor before and after the transfer; (5) cumulative effect of the transactions and course of conduct after onset of financial difficulties or threat of suit; and (6) general chronology and timing of events." *Shappell's Inc. v. Perry (In re Perry)*, 252 B.R. 541, 547 (Bankr.M.D.Fla.2000); *Ingersoll v. Kriseman (In re Ingersoll)*, 124 B.R. 116, 121 (M.D.Fla.1991).

■■■ As to the homestead transfer, several of the badges of fraud are present. The debtor transferred the property to his wife for no consideration and still lived in the property. Cornelius had transferred his interest in the business to his son and sold the Sandestin lot in which he had an interest. These transfers left him with no assets other than a car and a little personal property.

On the other hand, Cornelius testified that he told his attorney, Bruce Haught, about the transfer and assumed Haught would list it, if necessary. Mr. Haught testified that Cornelius did not tell him about the transfer. Cornelius only told him that the homestead of he and Mary Nash belonged to his wife and that she had used her money to buy it. This court cannot determine as between Cornelius and Haught who is telling the truth. Both, as evidenced throughout this opinion, have a tendency to be careless in their statements and actions. Haught did forget to add the deed to the 2004 amendments to Cornelius' schedules even when he clearly knew the facts. Cornelius, due to his medical and mental state around the time of filing, cannot be trusted to be completely accurate in his remembrances.

Although the transfer should have been disclosed, the nondisclosure did not harm the creditors, and disclosure of the transfer would not have aided them in any way in their search for assets. A Florida homestead of a debtor has an unlimited exemption and creditors have no right to any part of the homestead or its proceeds unless they hold a mortgage lien on the property. "Article X, Section 4, of the Florida Constitution 'exempts a homestead from forced sale and provides that no judgment or execution shall be a lien thereon.'" *Callava v. Feinberg*, 864 So.2d 429, 431 (Fla. 3d D.C.App.2004).

John Venn, the chapter 7 trustee in this case who has handled hundreds of chapter 7 cases in this district, stated that, without question, he would want to know of such a transfer. However, the answer was not a "crucial omission." Since the house was

fully exempt, the trustee had no ability to obtain any funds for creditors from it.

The court can see no benefit to the debtor in the omission, nor can the court see any facts to be gained from the disclosure that were likely to lead creditors to other assets. Since there could be no benefit in hiding the transaction, the court is convinced that Cornelius did not intend to hinder, delay or defraud creditors by omission of the deed transaction. *Fleet Securities, Inc. v. Vina (In re Vina)*, 283 B.R. 803 (Bankr.M.D.Fla.2002) (holding parents who transferred legal title to real estate equitably owned by their son and daughter-in-law to the son and daughter-in-law and did not list the transfer on their bankruptcy schedules were not denied a discharge on § 727(a)(2)(A) grounds). There is also the testimony of Cornelius that he told Haught about the transfer. It is a close call. However, as the law holds, close calls should be decided in favor of the debtor.

■ The U.S. Trustee asserts that the $5,000 earnest money check from N.I.C. Construction in September 2003 was a "theft of property" by Cornelius. It was also, per the Trustee, a transfer of property within one year of the bankruptcy filing that was intended to hinder, delay or defraud creditors. The U.S. Trustee did prove the existence of a transfer of the money to the sellers of the Cornelius/Nash homestead in September 2003. Fraudulent intent is a more difficult proof for the Trustee.

First, it is clear that, rather than taking a payroll check from N.I.C. Construction, Inc., both Mary Nash and William Cornelius often had the company directly pay expenses in lieu of salary. Those expense payments were then deemed income to Cornelius or Nash at year end when the accountant prepared the corporate and individual tax returns. Mr. Cornelius'

schedules indicate he earned $16,000 up to the time of the bankruptcy filing in 2003. If the $5,000 was included in that sum (or is even in addition to that sum), based upon prior years' earnings, he had taken no more than a reasonable salary. The $16,000 or $21,000 amount is not proof of any intent to hinder, delay or defraud creditors. The sum is a valid salary for someone performing the work Cornelius did. If the sum was included in Mary Nash's income for 2003, the same is true. Her salary of $40–50,000 per year was the same amount she had taken in prior years and was consistent with the divorce reconciliation settlement of the parties. If the money was her income, the transfer is also not a transfer of the debtor. The court concludes that the Trustee did not prove by a preponderance of the evidence that the $5,000 earnest money payment was not reasonable salary to Mr. Cornelius or to Ms. Nash. The court concludes that the use of money directly from the N.I.C. Construction account to pay the $5,000 was not done with fraudulent intent and/or was a transfer of Mary Nash's property, not Cornelius'.

■ The third transfer that the U.S. Trustee alleges is actionable under § 727(a)(2) is the series of checks William J. Cornelius wrote to himself (or that Mary Nash wrote to him) from August 14, 2002 to August 13, 2003, from the N.I.C. Construction, Inc. account. The Trustee's premise is that these checks were written for cash to conceal any income Cornelius might be earning from his creditors and prevent any garnishment. The evidence about the use of the funds from these checks came from William Cornelius and Mary Nash. William Cornelius stated that he got cash spending money from N.I.C. in very small amounts each month. The remainder of the money was used to pay construction workers in cash since many of

them had difficulty cashing checks. Like Cornelius, they operated without bank accounts into which they could deposit the checks. Mary Nash's testimony on this point was the same. Scott also indicated workers were at times paid in cash. The check records in evidence show that this testimony is credible. There are not a lot of checks that look like payroll checks being paid to employees. With gross income in 2002 of $535,162, there would need to be more employees than actual payroll checks would show. Therefore, the court concludes that the preponderance of the evidence does not support that the checks of Cornelius for "cash" constitute fraudulent transfers. The amounts given to Cornelius were used to pay company expenses and were not hidden income to the debtor.

The fourth transfer that the U.S. Trustee alleges is fraudulent is the series of $7,200 in postpetition checks that Cornelius wrote to himself. The testimony as to the purpose of the checks was the same as for the prepetition ones. The conclusion of this court is the same. The U.S. Trustee did not prove by a preponderance of the evidence that the transfers were fraudulent.

### B.

The second grounds for denial of discharge is § 727(a)(4). The Trustee asserts that the debtor engaged in a series of false oaths—in his schedules, at his § 341 meeting, at his Rule 2004 examination, at his deposition, and in his amended schedules. Section 727(a)(4) "ensures that ... 'those who seek the shelter of the Bankruptcy Code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest

based on fact rather than fiction.'" *Id.* at 675 (citations omitted). The Eleventh Circuit has stated that "[t]he veracity of the bankrupt's statements is essential to the successful administration of the Bankruptcy Act." *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 618 (11th Cir.1984). The plaintiff bears the burden of proving "that the false oath .. was made knowingly and fraudulently about a material matter." *Id.* at 676; *Swicegood v. Ginn,* 924 F.2d 230 (11th Cir.1991). For a false oath to be material, "it must be demonstrated that it 'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.'" *Matus* at 676. The court will deal with each situation in turn.

### 1.

Cornelius' initial bankruptcy schedules and statement of financial affairs were incorrect, according to the U.S. Trustee, in the following ways:

1. No disclosure of an interest in a 1999 Jeep Cherokee worth approximately $750

2. No disclosure of an auto loan of $4500 for the Jeep

3. No disclosure of his officer, director or ownership positions in any businesses in the six years before the bankruptcy filing date

4. No disclosure of income for the two years prefiling

5. No listing of codebtor status on his home loan

6. No listing of payments of $600 or more made to creditors within 90 days before filing

7. No listing of the transfer to his wife of his interest in their homestead within one year of filing

As to the automobile, the debtor thought that the auto was owned by the corporation or that the corporation was leasing it for him as it had in the past. In the amended schedules filed in 2004, Cornelius stated that he did own the car and was obligated on the loan. The court viewed Cornelius and gauged his credibility on this issue. His confusion about the manner in which ownership of the vehicle was held was understandable. N.I.C. Construction, Inc. paid the auto loan, so Cornelius thought both the title and the loan were in the company. Cornelius' carelessness about the vehicle title and loan did not rise to the level of fraud. The court does not believe that fraud was proven by a preponderance of the evidence.

Cornelius' failure to list his ownership and positions of power in N.I.C., Inc. and N.I.C. Construction, Inc. is a serious omission. Certainly, Cornelius knew these facts. However, he was not given the question to answer by Bruce Haught. Haught omitted the questionnaire section for Question 16 of the Statement of Financial Affairs. Therefore, the computer program, with no information provided, filled in the box stating "none." Cornelius should have read the Statement of Financial Affairs and seen the problem before he signed it. However, Cornelius testified that Bruce Haught knew of his businesses and his positions in them. He relied on him to complete Question 16, if necessary. John Venn testified that he would want to know of such business interests. Based upon Bruce Haught's error in not providing the portion of the questionnaire that asked for this information, the court concludes that, at worst, Cornelius inadvertently and carelessly omitted the information. His attorney's error caused the problem. Reliance on a professional can be a defense to this type of error. *Dubrowsky v. Estate of Arnold Perlbinder*

*(In re Dubrowsky)*, 244 B.R. 560, 575 (E.D.N.Y.2000) (stating that "the 'reliance upon advice of counsel' is not an impenetrable shield ... when it is transparently clear that the advice is improper"). In this case, Cornelius would not have known that his attorney did not provide him with the full list of questions to be answered. Haught caused the problem—not fraud by Cornelius.

Cornelius made $48,000 in 2001 and $48,000 in 2002 and $16,000 in 2003. On the statement of affairs, he did not list this income. If no information for question 1 on the Statement of Affairs is input into the bankruptcy computer program Bruce Haught used the statement of affairs shows the answer as "none." However, on Schedule I, Cornelius listed his monthly income as $2,000. Cornelius testified again that he relied on Bruce Haught. He also did not have Questions 1–3a to fill in that required this information. Bruce Haught did not catch the fact that page 15 of his form was missing. It was an oversight he stated. The court does not believe Cornelius' failure to disclose his income on the Statement of Affairs in answer to question 1 was fraudulent for two reasons. First, because Cornelius disclosed income on Schedule I. This shows he did not intend to hide the fact that he was earning an income from N.I.C. Construction, Inc. The trustee testified that the inconsistency between Schedule I and the Statement of Affairs would put him on notice of an issue to be inquired about. Second, Haught did not provide Cornelius with the page that contained this question, or, if Haught did give the page to Cornelius, he did not notice it was not returned. Cornelius and Haught were careless in omitting an answer to question 1, since it was inconsistent with Schedule I, but Cornelius was not fraudulent. Cornelius relied on his bankruptcy attorney who

caused the omission and/or should have noticed the omission of the pages. *Dubrowsky, supra.* Therefore, the evidence is at least in equipoise and the Trustee has not proven fraudulent intent by a preponderance of the evidence.

■ Mary Nash and Cornelius are co-debtors on the mortgage on their home. The debtor did not list this debt on schedule H. This omission was false. However, § 727(a)(4) requires that the omission be "material." For a false oath to be considered material, it must be demonstrated that it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Chalik,* 748 F.2d at 618 (citations omitted). The disclosure of this loan would not have led to information about any assets available to creditors or any improper uses of assets. Therefore, the court concludes that this omission was not material and therefore not actionable.

■ Cornelius did not list in answer to question 3a on the Statement of Affairs the payments on his home mortgage or the payment to the IRS of his 2001 delinquent taxes. These payments were made on his loans or debts within 90 days of the bankruptcy filing. First, Bruce Haught did not give him Question 3a, so Cornelius could not know to answer it. Second, the payments were not made directly by him. They were made by N.I.C. Construction, Inc. Third, Nash and Cornelius testified that the mortgage payments were made for her in lieu of salary and therefore were not payments by the debtor. Nash also testified, unrebutted, that she paid the debtor's taxes from the company without consulting anyone or telling anyone afterwards. In fact, Cornelius testified that he did not know about the IRS payment until a few days before this trial. Fourth, John Venn, the chapter 7 trustee, stated that, in

his opinion, Question 3a only asked for payments made by the debtor. If Nash made these payments, they did not need to be listed according to Venn's understanding. Based on this testimony, the court concludes that the mortgage payments were not paid by Cornelius and therefore his answer was truthful as to those payments. The court agrees with Mr. Venn that Question 3a is at least ambiguous as to whether payments by third parties for the benefit of the debtor need to be disclosed. Question 3a states:

> List all payments on loans, installment purchases of goods or services, and other debts, aggregating more than $600 to any creditor, made within 90 days immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

The language is ambiguous. Cornelius did not file a chapter 12 or 13 case. Therefore, the language could be read to say he does not need to include payments made by his wife, Mary Nash. Also, this language is often not followed correctly by debtors, no matter what chapter they use for their case. In 85% of the bankruptcy cases (17 of 20) studied in an empirical analysis of bankruptcy filings, no amounts were disclosed in answer to Question 3a even though the debtors had monthly incomes over $2,000 and monthly rent or mortgage payments over $600 per month. Honorable Steven W. Rhodes, *An Empirical Study of Consumer Bankruptcy Papers,* 73 AM. BANKR. L.J. 653, 676–77 (1999). For all of these reasons, the Trustee did not prove the omission was fraudulent. It was at best a misunderstanding. As to the IRS payment, he cannot have made an

intentionally fraudulent omission if he did not know of the payment.

■ The quitclaim deed of the homestead property of Cornelius to his wife within 60 days of the bankruptcy was not disclosed. Based upon the plain language of the statement of financial affairs, the transfer should have been disclosed. However, since the property is exempt regardless of the disclosure, the failure to disclose did not prevent the creditors from knowing any information about an asset available to them. The information would also not have led to any undisclosed items. John Venn, the chapter 7 trustee, stated that the failure to disclose the transfer was not a "crucial omission." In essence, Venn was stating that the omission was not "material." Based on this testimony, the court concludes that the omission should not be actionable.

### 2.

■ At his § 341 meeting, Cornelius stated that he had received no income from N.I.C. Construction, Inc. in 2002. This was false because Cornelius' tax returns show he earned $48,000 and he amended his statement of affairs to so state in 2004. This is a statement he had to know was incorrect. He knew that N.I.C. Construction was paying his auto loan, his telephone, his utility bills and his health insurance at a minimum. The court was given no explanation for this misstatement other than carelessness and Cornelius's alcohol and medication abuse. This statement was untrue and was material. The information was about his business dealings and might have led creditors to question other aspects of his relationship to N.I.C. Construction, Inc. This is an answer to a direct question about his income. This is unlike his failure to answer Statement of Affairs Question 1 when he did not have the form. The court concludes that the trustee has proved this transfer was a false oath by a preponderance of the evidence.

Cornelius stated that he deeded his residence interest to Mary Nash because it was her assets that bought it. The evidence is that Mary Nash clearly provided all of the funds that purchased the home except perhaps the $5,000 earnest money which came from N.I.C. Construction, Inc.'s checking account. Mary Nash testified that the $5,000 was also her money, a sum taken in lieu of salary. It is not clear that Cornelius, at the time of his 341 meeting, even knew that $5,000 had come from the business account because he testified that he did not remember that. The court cannot find that the statement was false when Cornelius made it. Therefore, the U.S. Trustee did not prove that Cornelius made the statement that Mary Nash's assets bought the house with fraudulent intent by a preponderance of the evidence.

Finally, at the first meeting of creditors, Cornelius stated that he lived off of the Driftwood Estates sales proceeds. This statement is the statement most clearly intended to hinder, delay, or defraud when considered in conjunction with the other statements Cornelius made about the lot sale proceeds. At the 2004 examination, he testified that it was back pay to Scott. At his Rule 30(B) deposition, he stated that he put the money in the company for it to use, but he expected to get it back.

John Venn testified that the sales proceeds information was important to him. He filed a lawsuit to recover the money from William S. Cornelius and N.I.C. Construction, Inc. The court concludes that the U.S. Trustee proved by a preponderance of the evidence that Cornelius made this untrue statement with fraudulent intent, or, if this statement was true, the other two statements were untrue. His testimony had the effect of confusing and delaying

the trustee and creditors at the very least—saying he lived off the money would lead one to believe the money was gone; saying it was back pay to his son would lead one to believe it was a gift that put the money out of reach; saying he expected to get it back when the company was making money would lead one to believe it was a loan that would take time to collect.

### 3.

At the Rule 2004 deposition, Cornelius stated that he had no personal financial records for the period from January 1, 2001 to August 13, 2003. He also stated that he had not had a bank account during that time. In fact, he had deposited $250,000 from N.I.C., Inc.'s account into a personal checking account on September 24, 2001. That money had remained in his own personal account until February 26, 2002 when he placed the remaining $141,-339,91 in N.I.C. Construction, Inc.'s account. Therefore, Cornelius' statement that he had no personal accounts was false. This is the most clear falsehood shown in this case. It would be hard to believe that anyone would not remember opening a bank account in his or her own name with $250,000 in it. This is Cornelius' story. The transfer was done at the same time as Robinson–Ceco was beginning to pursue Cornelius.[1] Robinson–Ceco and other N.I.C., Inc. creditors would want to know about transfers from the company that might be fraudulent transfers. Also, a sizeable amount of the money was deposited in N.I.C. Construction, Inc. within 18 months of the bankruptcy filing. This fact may have been important to determining why and how N.I.C. Construction, Inc. was formed and operated. Cornelius did not

convince the court that this omission was mere oversight. The court viewed Cornelius as he testified about this issue. The court does not believe that Cornelius did not remember this account. The Trustee sustained his burden of proving that this omission was knowing and material.

The statement was material because it "adversely affects the trustee's or creditors' ability to discover other assets or to fully investigate the debtor's prebankruptcy dealing and financial condition. Similarly, if the omission interferes with the possibility of a preference or fraudulent conveyance action the omission may be considered material." 6 King, COLLIER ON BANKRUPTCY ¶ 727.04[1][b]. In this case, Robinson–Ceco was hindered in its fraudulent transfer investigation at a minimum.

Cornelius stated that he worked for N.I.C. Construction, Inc., and it has "never been any different than working for them." This statement is disingenuous, but the court does not find it was fraudulent. It is true he had been an owner, director and officer, but it was true that his job had never changed during his years of working for N.I.C., Inc. or N.I.C. Construction, Inc. The court does not find the statement to be untrue; therefore, it is not actionable.

Cornelius stated that he gave the $123,865.34 sales proceeds from the Florida lot to his son as back pay. This statement was untrue if he lived off the money as he stated at the § 341 meeting or it was a loan as he stated at the Rule 30(B) deposition. Cornelius did in fact get some of the money in the form of living expenses and some of the money went to pay salary

---

**1.** Cornelius stated that he transferred the money to a personal account because of the divorce proceedings with his wife. The timing of the transfer is appropriate for that to be true. He and Mary Nash were separated in September 2001 and the transfer was done at that time. The transfer may not have been prompted by Robinson–Ceco because no action other than a threatening letter had occurred by that date. However, whatever the reason, the existence of the bank account needed to be disclosed.

to William S. Cornelius. The rest of the money funded other business expenses of N.I.C. Construction, Inc. Although William S. Cornelius did get some of the money through regular salary, it is not true that the debtor gave it to him as a gift or back pay. Stating that the money was a gift or back pay implies that the money was not available to the debtor at all or to anyone else. Such a transfer has fraudulent transfer implications. A statement like Cornelius' was material to the trustee and creditors and was untrue. The U.S. Trustee proved by a preponderance of the evidence that the statement was untrue and material and was knowingly false.

### 4.

At his deposition in March 2004, Cornelius further muddied the waters about the $123,865.34 sales proceeds. He stated that the money was "deposited for them [N.I.C. Construction, Inc.] to use. I expect to get the money back at some time." Again, as in the § 341 meeting and the Rule 2004 examination, Cornelius's statement is partially true. He did give the money to the business to use. He did get some of the money back as expenses. His statement made it sound like the funds were perhaps loaned to the company, which is different than the earlier characterizations. Again, a loan to the company raises other issues for the trustee and creditors. A loan is an asset of the debtor that might be recoverable. The statement, as the facts show, was inconsistent with Cornelius' other testimony. Only one use of the proceeds could be true—loan, gift, living expenses. Therefore, this one, or the others, had to be false and the misstatement was material. The Trustee has proved by a preponderance of the evidence that the statement was untrue and material.

### 5.

In his 2004 amendments to his schedules and statement of affairs filed on December 3, 2004, the debtor corrected all of the incorrect entries or omissions except that he still did not list the quitclaim deed of the homestead property to his wife. Cornelius had testified that he told Haught about the quitclaim deed at their first meeting, before the bankruptcy filing. Bruce Haught stated first that he and the debtor had never discussed the deed. However, Bruce Haught attended the § 341 meeting with the debtor. John Venn asked about the transfer and the fact that Cornelius was a codebtor on the mortgage. Cornelius testified that the transfer did occur and that he did not know why he did not list the transfer. He had "no reason not to put it" on the Statement of Financial Affairs. As a result of Cornelius' testimony at the § 341 meeting, Bruce Haught determined that amended schedules and an amended statement of affairs needed to be filed. When Haught was able to get Cornelius to do the amendments, Haught had Cornelius fill out new forms. Cornelius listed that he was a codebtor on the home mortgage on the forms he gave to Haught. Haught testified that his secretary did not put the information about the codebtor status on the new schedules and he missed it too. When Bruce Haught reviewed the transcript of the § 341 meeting at trial, he admitted that he knew about the quitclaim deed from Cornelius to his wife at least from that date. Bruce Haught also understood that he needed to correct that disclosure. The amended schedules and statement of financial affairs did not do so.

Cornelius should have determined that his quitclaim deed to his wife was not listed on the amended schedules. He did not. However, he was also relying on his attorney to make the amendments that Haught and the trustee had discussed at the § 341 meeting on October 3, 2003. The court concludes that his reliance on

his attorney to make the amendments that the trustee requested was proper. Therefore, he had no intent to deceive the trustee or creditors by not making the amendment. Also, as stated above, the transfer was not "material." It was therefore not actionable either. The U.S. Trustee did not prove that the 2004 amendments contained any knowingly false material statement.

## CONCLUSION

The U.S. Trustee did not sustain his burden of proof by a preponderance of the evidence of any grounds for denial of discharge pursuant to 11 U.S.C. § 727(a)(2). The U.S. Trustee did sustain his burden of proof by a preponderance of the evidence for denial of discharge pursuant to 11 U.S.C. § 727(a)(4) due to two false oaths: (1) Cornelius swore that he used the Florida lot proceeds to live on, to give back pay to his son, and as a loan to N.I.C. Construction, Inc.; (2) Cornelius swore that he did not have a personal bank account at any time from January 1, 2001 to August 13, 2003.

IT IS ORDERED AND ADJUDGED that the discharge of William J. Cornelius under 11 U.S.C. § 727(a)(4) is DENIED.